

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DAVID AUBEL and )<br>ROBERT RAFFA, )<br>)<br>Defendants. ) | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against defendants David Aubel ("Aubel") and Robert Raffa ("Raffa") (collectively, the "Defendants"):

## SUMMARY

1. The Defendants engaged in a scheme to defraud involving the publicly traded stock of Green Energy Renewable Solutions, Inc. ("Green Energy" or "EWRL") from at least April 2012 through at least January 2013 (the "relevant period"). The purpose of the scheme was to obtain illegal financial benefit for Aubel and Raffa at the expense of innocent investors by selling shares of Green Energy's stock to those unsuspecting investors at artificially high prices. Aubel and Raffa took steps to secretly acquire a large quantity of Green Energy stock and to disguise their ownership interest in the stock. Aubel and Raffa then manipulated, and thereby artificially increased, the share price and trading volume of Green Energy's stock, before selling millions of shares of the stock to investors unaware of the artificial increase in price for proceeds

of more than $1.6 million. The defendants sold the stock into a segment of the public securities markets known as the Over-the-Counter securities market, or the "OTC Market."

2. At various times material to this complaint, Green Energy was a Florida corporation based in Detroit, Michigan, and it purported to be in the business of developing waste processing and recycling facilities. Green Energy's stock was registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") and its stock was quoted in the OTC Market under the symbol "EWRL."

3. The OTC Market, also referred to as the microcap market, is a marketplace for buying and selling shares of stock in companies with more limited assets and lower stock prices than companies listed on the major stock exchanges. Approximately 10,000 companies have shares that trade on the OTC market's two inter-dealer quotation systems: the OTC Bulletin Board (OTCBB) and OTC Link (formerly known as "Pink OTC Markets Inc." or "the Pink Sheets"). The OTC Market is decentralized, without an actual physical location where stocks can be bought and sold. Instead, buyers and sellers in the OTC Market trade with one another through various modes of communication such as the telephone, email and proprietary electronic trading systems. The OTC Market is less transparent than, for instance, stock exchanges, and also subject to fewer regulations.

4. Raffa and Aubel accomplished their fraudulent scheme, by, among other things, (a) secretly obtaining a significant percentage of Green Energy's stock and holding the stock in offshore accounts they controlled but in which the shares of stock were not held in their names ("nominee accounts"); (b) further disguising their ownership of a large percentage of Green Energy's stock by failing to file required SEC disclosure reports; (c) engaging in various types of manipulative trading designed to artificially increase or otherwise stabilize Green Energy's stock price, as well as artificially increasing the trading volume of the stock; (d) orchestrating and paying for promotional campaigns designed to spark investor interest in Green Energy with,

among other things, misleading and/or incomplete information; and (e) ultimately selling millions of shares of Green Energy stock to unsuspecting investors, thereby obtaining proceeds of more than $1.6 million.

5. The Defendants' conduct violated various antifraud, registration, and disclosure rules and regulations of the SEC and of the federal securities laws, specifically Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a) and (c); 15 U.S.C. § 77q(a)(1) and (3)] and Sections 10(b), 13(d), and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(d) and 78p(a)] and Rules 10b-5(a), 10b-5(c), 13d-1, 13d-2, and 16a-3, thereunder [17 C.F.R. §§ 240.10b-5(a) and (c), 240.13d-1, 240.13d-2 and 240.16a-3].

6. Based on these violations, the Commission seeks: (1) entry of permanent injunctions prohibiting the Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of the Defendants' ill-gotten gains, plus pre-judgment interest; (3) the imposition of civil monetary penalties due to the egregious nature of the Defendants' violations; and (4) such other and further relief as the Court deems just and proper.

## AUTHORITY, JURISDICTION and VENUE

7. The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b) and (d), and 77v(a) and (c)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

3

9. The District of Massachusetts is the proper venue for this action under 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within and/or affected the District of Massachusetts, as well as investors and prospective investors residing in the District of Massachusetts.

10. The Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mail in connection with the acts, practices, and courses of business alleged herein.

11. The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## **DEFENDANTS**

12. David Aubel, 57, resided in Florida during the relevant period and was a significant shareholder of Green Energy's common stock.

13. Robert Raffa, 56, resided in New Hampshire during the relevant period and was a significant shareholder of Green Energy's common stock.

### **THE SCHEME TO MANIPULATE THE PRICE AND TRADING VOLUME OF GREEN ENERGY STOCK AND TO PROFIT FROM ITS SALE**

**A. Aubel and Raffa Secretly Obtain Ownership and Control of Large Blocks of Green Energy Stock**

14. By at least April 2012, the Defendants initiated a scheme to secretly control a large percentage of Green Energy's stock, to manipulate the price and trading volume of the

4

stock and to profit by selling millions of shares of the over-priced Green Energy stock to innocent investors.

15. As of April 2012 the Defendants had acquired convertible promissory notes previously issued by Green Energy in order to obtain financing. The promissory notes were financial instruments reflecting loans received by Green Energy and the company's agreement that the debt reflected in those loans could be converted into equity in the company by the holders of the notes. The Defendants caused the conversion of those notes into equity that entitled them to approximately 6.5 million shares of Green Energy stock and arranged for the stock to be held for their benefit in nominee accounts at a broker-dealer doing business in Panama. The nominee accounts were in the name of Panamanian business corporations called Brookside International Ltd., Network Communications Inc., Concept Assets Inc., and Sierra Consultant Corp. (the "Panamanian Entities"), which the Defendants controlled.

16. In order to sell the shares of Green Energy in the OTC Market, Aubel and Raffa sought to have the 6.5 million shares deemed "unrestricted," which would enable them to sell the shares directly to the investing public. The Defendants accomplished this by arranging for the transfer agent responsible for maintaining records tracking the ownership and status of Green Energy's stock to receive opinion letters representing that none of the four Panamanian Entities were affiliates of Green Energy. The opinion letters were false because Aubel and Raffa were operating through and controlled the Panamanian Entities.

17. The Panamanian Entities were, in fact, affiliates of Green Energy, as were Aubel and Raffa. An "affiliate" of an issuer (here, Green Energy) is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer. Aubel and Raffa controlled Green Energy because of their significant

Case 1:16-cv-10670-LTS Document 46-1 Filed 02/22/19 Page 6 of 20
Case 1:16-cv-10670 Document 1 Filed 04/07/16 Page 6 of 20

ownership of Green Energy's stock. The Panamanian Entities were affiliates because they, like Green Energy, were controlled by Aubel and Raffa.

18. The 6.5 million shares of Green Energy stock owned and controlled by the Defendants, through the Panamanian Entities, represented approximately 92% of Green Energy's purported unrestricted stock as of April 2012, as well as approximately 26% of the total outstanding shares (restricted and unrestricted) of the company's stock, which far exceed the 10% threshold for qualifying as an affiliate. Aubel and Raffa also qualified as affiliates because the large percentage of Green Energy stock they owned and controlled, directly and indirectly, gave them the ability to control or influence Green Energy.

19. Aubel was well aware that he held control over Green Energy. In fact, during a call secretly recorded during a Federal Bureau of Investigation (the "FBI") undercover investigation, Aubel was asked if he controlled Green Energy and he advised, in response, that he had control over the company through a lawyer, who was his partner and who had put the deal together.

20. Because the Panamanian Entities, as well as Aubel and Raffa, were affiliates of Green Energy, any sales of the company's stock by the Defendants, whether directly or through the nominee accounts, were subject to sales and volume limits imposed by SEC Rule 144. SEC Rule 144 limits the volume of securities that may legally be sold for the account of an "affiliate" of an issuer to the greater of one percent of the shares or other units of the class of outstanding stock as shown by the most recent report or statement published by the issuer, or the average weekly reported volume of trading in such securities.

21. In addition to concealing their ownership and control of 6.5 million shares of Green Energy stock by using nominee account holders and the false opinion letters, Aubel and

6

Raffa also failed to file required disclosure forms with the SEC. Officers and directors of a company, as well as persons who are beneficial owners of more than 10% of a SEC-registered issuer's stock are generally required to file SEC Form 3, which is an initial statement of beneficial ownership. An individual or entity that owns and exercises control of shares of stock is the beneficial owner of the stock regardless of whether the stock is held in a third party's name and/or account (i.e., "nominee accounts"). In addition, after effecting transactions, beneficial owners are required to file SEC Form 4, which discloses changes in beneficial ownership. Finally, persons who are beneficial owners of more than 5% of a SEC-registered issuer's stock are generally required to file disclosure reports on Schedule 13D, as well as related amendments to Schedule 13D reflecting material changes.

22. During the relevant period the Defendants were the beneficial owners of the 6.5 million shares of Green Energy stock and they sold millions of shares of the stock in the OTC Market, all without filing SEC Form 3, a Schedule 13D disclosure report or SEC Form 4. Aubel and Raffa knew, or were reckless in not knowing, that they were required to file SEC Forms 3 and 4 and a Schedule 13D.

**B.** **Aubel and Raffa Orchestrate the Initial Promotional Campaign for and Sales of Green Energy Stock**

23. Having obtained millions of shares of Green Energy stock and fraudulently arranged to have those millions of purportedly unrestricted shares at their disposal both directly and through their use of nominee accounts, the Defendants orchestrated a promotional campaign in late June and early July, 2012, designed to increase Green Energy's stock price (the "Initial Promotion"). At or about the same time, the Defendants intended to sell, and secretly did sell, shares of Green Energy stock to investors.

7

24. During the summer of 2012, to launch the promotional campaign, Aubel and Raffa hired various stock promoters, sometimes characterizing the payments as being targeted for "investor relations services."

25. First, Green Energy issued a series of press releases designed to create the illusion that the company was thriving and expanding, which was not the case. The first press release, issued on June 25, 2012, stated: "Green Energy purchased a 5-acre parcel of land in Highland Park, Michigan in November 2011 and began preparation of the site to receive construction and demolition ("C&D") waste. The site is cleared and most of the necessary equipment is in place to receive waste material and begin advanced recycling operations to recover valuable materials in the waste stream. Green Energy is working closely with local officials to complete the permitting process and expects to commence full operations within 60 days." The press release was misleading in that the 5-acre parcel was never cleared and, aside from a rental scale, no equipment was ever placed on the site to receive waste material and begin advanced recycling operations. The parcel never was intended to be used for recycling operations.

26. On June 27, 2012 the company issued another press release stating: "Green Energy Renewable Solutions (OTCQB: EWRL) announced today that it has signed a long term contract with Disposal Specialties, LLC of Birmingham, Michigan that will guarantee up to 1,000 tons per day of construction and demolition waste for recycling operations at its Highland Park, Michigan facility." The press release was misleading in that there was no "facility" in Highland Park, Michigan apart from a 5-acre parcel of unimproved land.

27. From approximately June 26, 2012 through July 6, 2012, stock promoters, whom the Defendants hired, touted Green Energy in various forums and through various media with statements like "I Believe That EWRL Will Be A Huge Win Over At Least 3 Days! . . . EWRL

8

Is The Mirror Image Of What Archer Daniels Was 20 Years Ago! . . . all this could make EWRL one of the most solid and largest percentage gainers, possibly yielding 2000-3000% returns in the super short term!" The promotions and promotional materials were materially misleading. First, there was no disclosure that these promotions were funded by the Defendants, that is Green Energy affiliates who secretly owned and controlled millions of shares of Green Energy stock and who intended to dump those shares into the OTC Market and sell them to unsuspecting investors if and when the promotional efforts led to a rise in stock price. Second, the materials *in toto* were designed to create the impression that Green Energy was a vibrant, active company when, in fact, its actual business operations were nearly dormant and there was no basis for representing that its fortunes were on the rise. Third, the promotional materials themselves contained material misstatements by incorporating the misstatements made in Green Energy's June 25 and June 27 press releases.

28. Green Energy's stock price and trading volume increased dramatically as a result of the promotional campaign conceived, orchestrated, and paid for by Aubel and Raffa. Green Energy's stock price rose from approximately $.01 per share on or about June 1, 2012 to as high as approximately $.88 per share on or about June 29, 2012. In addition, the trading volume of Green Energy's stock increased from zero shares traded on or about June 1, 2012, to millions of shares traded per day during much of the Initial Promotion.

29. Aubel and Raffa took advantage of the increased investor interest and rise in the stock price by selling several million shares of Green Energy stock to unsuspecting investors without disclosing their role in the touting of Green Energy's stock or their controlling interest in Green Energy. From June 20, 2012, through July 27, 2012, Aubel and Raffa sold approximately 2.5 million shares of Green Energy stock for approximately $1 million in proceeds.

9

30. Shortly after the stock sales, Aubel and Raffa wired more than $324,000 in stock sale proceeds from Panama to a company called International Coastal Financial, Inc. ("ICF"), which was controlled by Aubel. In addition, a law firm in Panama wired approximately $432,000 in stock sale proceeds to ICF. Aubel, through ICF, then wired at least $25,000 from the proceeds to a purported consulting company controlled by Raffa.

31. Aubel and Raffa knew, or were reckless in not knowing, that they were required to disclose their stock ownership and sales in filings with the SEC. At no time before, during or after the Initial Promotion did Aubel or Raffa file the disclosures required in SEC Form 3, SEC Form 4, Schedule 13D, or otherwise. Aubel and Raffa failed to make the required filings and disclosures in order to hide their ownership and sales of Green Energy stock.

    **C.**    **The Sales of Green Energy Stock Made and Caused by Aubel and Raffa, by Entities They Controlled, Exceeded Legal Limits on "Affiliate" Sales**

32. The stock sales of the Defendants were subject to sales and volume limits imposed by SEC Rule 144 because the Defendants were "affiliates" of Green Energy.

33. An "affiliate" of an issuer (here, Green Energy) is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.

34. The defendants controlled Green Energy because of their significant ownership of Green Energy's stock.

35. SEC Rule 144 limits the volume of securities legally able to be sold for the account of an "affiliate" of an issuer to the greater of one percent of the shares or other units of the class of outstanding stock as shown by the most recent report or statement published by the issuer, or the average weekly reported volume of trading in such securities.

10

36. The Defendants sold approximately 2.5 million shares of Green Energy's stock from approximately June 2012 through July 2012. Green Energy's SEC filing for the quarter ended June 30, 2012 disclosed the number of Green Energy's total outstanding shares of common stock as approximately 63 million shares. Defendants' stock sales exceeded the proscribed limits imposed by SEC Rule 144.

    **D.    Aubel and Raffa Take Steps to Stabilize Green Energy's Stock Price to Set the Stage for Further Promotions and Stock Sales**

37. Following the Initial Promotion, Aubel and Raffa still controlled millions of shares of Green Energy stock, which they intended to sell. To that end, the Defendants took steps to artificially prop-up Green Energy's stock price, which would enable them to sell the stock they controlled at artificially higher prices.

38. In late August, 2012, Aubel and Raffa contacted an individual who they believed could assist them with further promotions of Green Energy stock. Unknown to the Defendants, the individual they contacted was an individual cooperating with federal law enforcement authorities (the cooperating individual or "CI") and working with undercover agents of the FBI who were investigating market manipulation activities.

39. Aubel and the CI spoke by telephone on September 6, 2012. The call was recorded as part of the FBI's undercover investigation. During the September 6 call, Aubel boasted to the CI that he and Raffa had sold approximately two million shares of Green Energy stock during a recent promotion. Aubel also told the CI that he had just purchased approximately 40,000 shares of Green Energy stock to increase the bid price (i.e., the price at which investors would expect to buy stock). Aubel made the purchase through a series of "buys" using a brokerage firm in Panama. Aubel explained to the CI that he entered the buy orders to prevent Green Energy's stock price from declining. Four of the purchases in the series resulted

11

in an uptick, or increase, in the price of Green Energy's stock. One neutralized a downtick, or decrease, in its price. These buy orders, which were entered to influence Green Energy's stock price, were false and misleading because they appeared to show legitimate market demand.

40. In addition, later in the same September 6 call with the CI, Aubel advised that he planned to buy Green Energy stock at the end of the day for the purpose of generating an uptick in the stock price, a manipulative trading practice known as "marking the close."

41. "Marking the close" is a form of stock price manipulation that involves the placing and execution of orders shortly before the close of trading on any given day to artificially influence the closing price of the security. Aubel made it clear during the September 6 call with the CI that he intended to "mark the close" and to cause an artificial price uptick in Green Energy's stock with late-in-the-day transactions.

42. Consistent with what he told the CI, late that day Aubel, through one of his Panamanian Entities, bought approximately 1,000 shares of Green Energy stock during the last trade of the day at approximately $.11 per share. That purchase had the effect of raising Green Energy's stock price from the price at which the second-to-last trade that day had been executed--approximately $.095 per share. Aubel engaged in similar trading activity on a series of additional days, marking the close on those days as well.

43. Aubel knew when he made these late-in-the-day purchases, or was reckless in not knowing, that he was marking the close, which he intended to operate as a fraud or deceit upon investors.

E. **Aubel and Raffa Plan and Execute a "Cross Trade" Intending to Finance Further Promotions and Stock Sales**

44. Following the Initial Promotion, Aubel and Raffa took steps to liquidate the remaining shares—approximately 10 million—of Green Energy that they controlled.

12

45. For example, they sought to raise additional financing for further promotional campaigns and/or they discussed selling their remaining shares through, among other things, cross trades. A cross trade as referenced herein is a coordinated trade in which two parties agree to trade stock at a prearranged date and price.

46. In late August 2012, Aubel and Raffa contacted the CI for assistance with a second touting campaign in order to "get liquid," or obtain financing in exchange for stock. During a telephone call with the CI on September 6, 2012, that was recorded as part of the FBI's undercover investigation, Aubel and Raffa arranged with the CI to have an associate of the CI—who purported to represent brokers willing to buy stock for their customers in exchange for a kickback—to purchase shares of Green Energy in order to generate $150,000 to $250,000. Their expectation was that the proceeds then would be used by the CI to launch a digital marketing campaign for Green Energy. Unknown to the Defendants, the CI's associate was an agent of the FBI acting in an undercover capacity (the "undercover agent") and the brokers were fictitious.

47. Ultimately, the defendants' intent was that a cross trade (the "Cross Trade") would be executed between the Defendants and the undercover agent so that: (a) the Defendants could sell stock in order to obtain money to finance another promotional campaign; and (b) the Defendants could continue to indirectly control the stock by providing a kickback to the purchaser of the Green Energy stock, the undercover agent, to ensure that the purchaser would not resell the stock at a time that could negate the effects of a promotional campaign.

48. Aubel and Raffa both participated in the September 6 recorded telephone call with the CI. During that call, the Defendants arranged for the undercover agent to use purported broker associates to purchase shares of Green Energy in exchange for money, which could subsequently be used by the CI to launch the digital promotional campaign.

13

49. Following the September 6 call, Raffa and the CI engaged in at least one additional recorded telephone conversation to work out the details of the Cross Trade. In particular, Raffa and the CI discussed and agreed that one of the undercover agent's purported broker associates would purchase approximately 174,000 shares of Green Energy stock at approximately $.115 per share (for a cost of approximately $20,000) from the Defendants on September 7, 2012, and that the undercover agent would receive a $6,000 kickback.

50. On or about September 7, 2012, Raffa engaged in the Cross Trade.

51. Thereafter, on or about September 19, 2012, the Defendants wired $6,000 to the undercover agent's bank account through a nominee entity controlled by Aubel.

52. Armed with new capital, Aubel and Raffa orchestrated additional promotional campaigns concerning Green Energy's stock in approximately September 2012, November 2012, and January 2013 and, in connection with the promotions, sold millions of additional shares of Green Energy stock.

53. For example, in or about September 2012, the Defendants sold hundreds of thousands of shares of Green Energy stock for net proceeds of approximately $41,000. Thereafter, during the promotion of Green Energy's stock in November 2012, the Defendants sold millions of additional shares of Green Energy for net proceeds of over $400,000.

54. On or about December 28, 2012, the Defendants wired approximately $10,000 to a stock promoter, which then, along with other stock promoters, touted Green Energy from on or about and between January 1, 2013 and January 4, 2013.

55. In or about January 2013, the Defendants sold approximately 1,390,000 shares of Green Energy stock for net proceeds of approximately $30,000.

14

56. The Defendants did not disclose their intent to sell stock or their stock sales to the SEC or any prospective investors throughout 2012 and 2013. During the subsequent promotional campaigns Aubel and Raffa sold millions of additional shares of Green Energy stock in the OTC Market, all without filing SEC Form 3, a Schedule 13D disclosure report or SEC Form 4. Aubel and Raffa knew, or were reckless in not knowing, that they were required to file SEC Forms 3 and 4 and a Schedule 13D. Aubel and Raffa failed to make the required filings and disclosures in order to hide their ownership and sales of Green Energy stock.

57. In none of the materials used in the promotional campaigns did Aubel or Raffa disclose that funding for the promotion came from them, when they secretly owned and controlled millions of shares of Green Energy stock and intended to dump those shares into the OTC Market and sell them to unsuspecting investors if and when the promotional efforts led to a rise in stock price.

**First Claim for Relief**
**(Violations of Sections 17(a)(1) and (3) of Securities Act)**

**(As to Both Defendants)**

58. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 57 above as if set forth fully herein.

59. By reason of the foregoing, the Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

60. By engaging in the conduct described above, the Defendants have violated, and

15

unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act.

## Second Claim for Relief
### (Violations of Section 10(b) of Exchange Act and Rules 10b-5(a) and (c))

**(As to Both Defendants)**

61.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 57 above as if set forth fully herein.

62.     By reason of the foregoing, the Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading; or (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

63.     By engaging in the conduct described above, the Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

## Third Claim for Relief
### (Violations of Section 5(a) and Section 5(c) of the Securities Act)

**(As to Both Defendants)**

64.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 57 above as if set forth fully herein.

65.     From at least the fall of April 2012 through January 2013, the Defendants directly or indirectly, as to Green Energy securities: (a) made use of the means or instruments of

16

transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the Commission or being in effect as to such securities.

66. The Defendants were underwriters as defined in 17 C.F.R. 230.144 ("SEC Rule 144").

67. The Defendants stock sales exceeded the restrictions set by SEC Rule 144(e).

68. By reason of the foregoing, the Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act.

### Fourth Claim for Relief
### (Violations of Exchange Act Section 13(d)
### And Rules 13d-1 and 13d-2)

**(As to Both Defendants)**

69. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 57 above as if set forth fully herein.

70. The Defendants, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l], failed to file with the SEC a statement containing the information required by Schedule 13D [17 C.F.R. § 240.13d-101] and, after disposing of beneficial ownership of securities in an amount equal to 1% or more of the class of securities, failed to file with the SEC

17

an amendment disclosing this material change.

71. By reason of the foregoing, the Defendants have violated, and unless enjoined will continue to violate, Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2.

### Fifth Claim for Relief
**(Violations of Exchange Act Section 16(a) and Rule 16a-3)**

**(As to Both Defendants)**

72. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 57 above as if set forth fully herein.

73. The Defendants, after acquiring directly or indirectly the beneficial ownership of more than 10% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l], failed to file with the SEC a Form 3 providing an initial statement of beneficial ownership and, after effecting transactions in the securities, failed to file with the SEC Form 4 providing statements of changes in beneficial ownership.

74. By reason of the foregoing, the Defendants have violated, and unless enjoined will continue to violate, and unless restrained and enjoined will in the future violate, Section 16(a) of the Exchange Act and Rule 16a-3.

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter permanent injunctions restraining the Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]; Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder (17 C.F.R. § 240.13d-1, 13d-2); and Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

B.  Require the Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest;

C.  Require the Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.  Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.   Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:  Boston, Massachusetts
        April 07, 2016

                                        On behalf of the Commission,


                                        _____//s// Martin F. Healey_____
                                        Martin F. Healey (MA BBO No. 227550)
                                        Eric A. Forni (MA BBO No. 669685)
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Boston Regional Office
                                        33 Arch Street, 24th Floor
                                        Boston, Massachusetts  02110
                                        (617) 573-8952 (Healey)
                                        HealeyM@sec.gov
                                        (617) 573-8827 (Forni)
                                        ForniE@sec.gov